# In the United States Court of Federal Claims

No. 14-549C
(Filed: January 10, 2019)

|  |  |  |
|---|---|---|
| ULTIMATE CONCRETE, LLC, | ) | Keywords: Contract Disputes Act |
|  | ) | ("CDA"), 41 U.S.C. § 7104; Motion for |
| Plaintiff, | ) | Summary Judgment, RCFC 56; Contract |
|  | ) | Interpretation; Critical Path; Defective |
| v. | ) | Specifications. |
|  | ) |  |
| THE UNITED STATES OF AMERICA, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

*Thomas M. Keranen*, Clark Hill PLC, Detroit, Michigan, for Plaintiff, with whom was *Jeffrey M. Gallant*, Clark Hill PLC.

*James W. Poirier*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant, with whom were *Claudia Burke*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General.

## OPINION AND ORDER

KAPLAN, J.

This case, which is before the Court on cross-motions for partial summary judgment, was brought under the Contract Disputes Act ("CDA"), 41 U.S.C. § 7104(b)(1), by Plaintiff Ultimate Concrete, LLC ("UC"). It arises out of disagreements between UC and the United States Section of the International Boundary and Water Commission ("IBWC") concerning the interpretation and performance of a contract to rehabilitate, renovate, and perform new construction on an existing levee on the Rio Grande River.

UC's motion for partial summary judgment seeks a favorable finding as to liability for two of its claims. First, it seeks summary judgment in its favor on its claim for an equitable adjustment of the contract price based on the imposition of what it contends was a new requirement that it excavate and replace materials on a part of the existing embankment, rather

than leave them in place (the "REA 7-8-9" claim).[1] Second, UC requests that the Court find, as a matter of law, that the survey data the government provided in the contract specifications was defective and that the government failed to take reasonable steps to cure the defects (the "Defective Specifications" claim).

Meanwhile, the government has cross-moved for partial summary judgment on two of UC's claims: 1) the REA 7-8-9 claim; and 2) the "Early Delays" claim, which is a subpart of the Defective Specifications claim. "Early Delays" refers to alleged delays during the beginning of contract performance which—according to UC—were caused by the defective survey data provided by the government, particularly when combined with the government's failure to correct the defects in a timely manner.

For the reasons set forth below, the government's cross-motion is **GRANTED** as to the REA 7-8-9 claim, and UC's motion is **DENIED** as to that claim. UC's motion is **GRANTED** as to its Defective Specifications claim, and the government's cross-motion for summary judgment as to that claim is **DENIED**.

## BACKGROUND[2]

### I.      The Rio Grande Canalization Project and Need for Levee Rehabilitation

The contract at issue in this case involved improvements to a levee system. The subject levee is part of the Rio Grande Canalization Project, which was completed in 1943 and extends 105.6 miles along the United States–Mexico border between El Paso, Texas and Caballo Dam, New Mexico. Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") Ex. 3, ECF No. 107-2. The "Canalization System" is maintained and administered by IBWC, which also administered the contract at issue in this case. See id.

In 2008, IBWC engaged contractors who, among other things, evaluated a 31-mile portion of the Canalization System known as the Canutillo Levee Segment. See, e.g., Pl.'s Mot. Ex. 1, ECF No. 107-1. Based on their findings and conclusions, IBWC in 2010 "determined that certain reaches of the levees require[d] rehabilitation improvements in order to meet FEMA requirements for the safe containment of 100-year flood flows." Pl.'s Mot. Ex. 3 at 1.

Accordingly, at IBWC's request, its contractor (S&B Infrastructure, Ltd. ("S&B")) prepared drawings and plans for a series of construction projects to rehabilitate the Canalization System. One of these projects—the "Upper Rio Grande Flood Control Project (URGFCP), Sunland Park Canutillo Levee Segment, Dona Ana County, NM and El Paso County, TX" ("the Project")—is the subject of the contract at issue in this case. App. to Def.'s Resp. to Pl.'s Mot.

---

[1] As discussed in greater detail below, "REA" refers to UC's request for equitable adjustment, and "7-8-9" refers to Typical Sections 7, 8, and 9—sections of the levee as depicted in the Solicitation drawings and plans.

[2] Unless otherwise indicated, the facts set forth in this section are not in dispute.

for Partial Summ. J., & Def.'s Cross-Mot. for Partial Summ. J. ("Def.'s App.") at A1, ECF No. 119-1.

## II.     Factual Background of the REA 7-8-9 Claim

### A.     The Solicitation, Amended Solicitation, and UC's Winning Bid

IBWC issued Solicitation IBM10B0004 ("the Solicitation") in connection with the Project on August 2, 2010. Id. The estimated contract price listed was between $10 million and $20 million. Id. The scope of work, generally speaking, "consist[ed] of the rehabilitation of a portion of the Canutillo Levee System designated at Sunland Park . . . for approximately 11.82 miles." Specification 01.19.00, Scope of Work, Def.'s App. at A129, ECF No. 119-1. "Major construction efforts" under the contract would include raising the existing levee; building new levee segments; installing a clay cap to the existing levee; building retaining walls where shown on the plans; rehabilitating "various appurtenances to the levee" (such as sluice gates, pipe crossings, connecting roadways, etc.); installing toe drains where shown on the plans; and installing new vehicular gates, road signs, and fences. Id. at A129–30.

The Solicitation referred prospective bidders to a website where they could download drawings depicting the design of the Project. Def.'s App. at A12. Included in the drawings were ten "typical" sections representing certain portions of the levee. See id. at A660–67, ECF No. 119-1; Pl.'s Mot. Ex. 35, ECF No. 107-3. Typical Sections 7, 8, and 9 (denoted with roman numerals on the drawings) are the portions of the levee that are relevant to this case.

Also relevant to the issues raised in this case is § 2.1 of specification 35.41.00, which governs the fill, drainage, and other materials the contractor would be required to furnish in connection with the construction of the levee. Subsection F of § 2.1 gave contractors the option of "re-us[ing] the salvaged material excavated from the existing levees" either "blended with other material or not." Def.'s App. at A1273, ECF No. 119-4. In either case, § 2.1F provided, "the final product must meet or exceed all material requirements from this specification and in the general notes section of the plans." Id.

Finally, two contract line item numbers ("CLINs") set out in the Solicitation are also relevant to the instant dispute. CLINs 9 and 10 both relate to specification 35.41.01 (entitled "raise the levee"). CLIN 9 contained an estimate of the quantity of materials expected to be removed ("bench excavation") and CLIN 10 supplied an estimate of the quantity of materials to be placed ("embankment"). Def.'s App. at A7–8. Payment for CLINs 9 and 10 was to be calculated by multiplying the total number of cubic yards excavated or placed, respectively, by a unit price to reach a total price. Id. at A7–8; A302, ECF No. 119-1.

### B.     Pre-Bid Meeting and Amended Solicitation

A pre-bid meeting and a site visit were held on August 12, 2010. Pl.'s Mot. Ex. 36, ECF No. 107-3. According to Jesse Guzman, UC's Managing Member, questions were posed to IBWC representatives during the site visit concerning the rehabilitation work that IBWC in-house crews had performed during 2009. Aff. of Jesse Guzman, Pl.'s Mot. Ex. 57 ¶ 10, ECF No. 107-4. In particular, according to Mr. Guzman, several bidders asked whether—given the recency of the rehabilitation—the existing embankment could be left in place instead of removed

3

as required by the specifications and drawings for Typical Sections 7, 8, and 9. Id. In response, according to Mr. Guzman, IBWC representatives stated that the agency was planning to issue an addendum to the original Solicitation that would address their questions. Id.

After the site visit, prospective bidders submitted written questions about the Solicitation for response by IBWC.  Two of those questions concerned the quantity and quality of any salvageable material that could be employed in the construction of the levee:

> **Question 8:** It was mentioned during the walk through that some amount of materials i.e., gravel/clay, would be available. What is the type, amount and location? We are particularly concerned with the clay.
>
> . . .
>
> **Question 9:** We are very interest[ed] to bid on the subject line project. Previously on August 12, 2010 and during the site visit, one of your team mentioned that in a couple days from the site visit you would provide us info about the availability of clay materials and the quantity, as you know this is very essential to our bidding, please provide us with that information.

Def.'s App. at A1056, ECF No. 119-4.

Notably, there were no written questions submitted about whether the embankment that had been rehabilitated the preceding year by the in-house crews could be left in place. Further, the pre-bid meeting minutes specified that questions "must be submitted in writing" and that "[a]ny verbal answers to question[s] [were] not binding." Pl.'s Mot. Ex. 36.

On August 27, 2010, IBWC published an amendment to the Solicitation ("the Amended Solicitation" or "Addendum 1"). Def.'s App. at A1051, ECF No. 119-4. The amendment included "response[s] to questions received; revised specifications/plans download information," and a "revised bid schedule." Id.

The Amended Solicitation reproduced questions 8 and 9 (above) and answered each identically. It advised that "[t]hrough addendum the information will be made available on the plans and specifications" and it referred bidders to a geotechnical memorandum entitled "Fill Requirements for the proposed USIBWC Maintenance Projects" dated December 9, 2009. Id. at A1056; see also Pl.'s Mot. Ex. 49, ECF No. 107-4 (referenced geotechnical memorandum).

In addition—and central to the issues raised in the parties' cross-motions for partial summary judgment as to UC's REA 7-8-9 claim—the Amended Solicitation added a new paragraph to specification 00.31.19, which was entitled "Existing Condition Information." The new paragraph stated as follows:

> A portion of the levee at the following locations; from Country Club Bridge to a point located 1.25 miles upstream of Country Club Bridge on the East Levee (CE2), from Country Club Bridge to a point located 1.25 miles upstream of Country Club Bridge on the West Levee (CW2) and from Country Club Bridge to a point located 3.75 miles downstream of Country Club Bridge on the East Levee (CE2) has been

modified from the time of the original Geotechnical report completed in December, 2008. A subsequent Memorandum (RE: Fill Requirement for The Proposed USIBWC Maintenance Projects) dated December 9, 2009 was issued to assess the placed fill materials. [See Pl.'s Mot. Ex. 49.] <u>Approximately 232,300 tons of impervious material has been placed on the levee and may be suitable embankment at the contractor's discretion</u>.

Def.'s App. at A1090, ECF No. 119-4 (emphasis supplied).

The Amended Solicitation also contained certain new passages in the "General Notes" section of the drawings. Among these new passages was the following guidance:

Existing levee embankment shown in Typical Sections VII, VIII & IX contains approximately 232,300 tons of previously placed material which may be suitable embankment material. The embankment material quantity previously placed is approximate and is provided for information only. All embankment material including salvaged material shall meet the requirements of specification 35 41 00 CONSTRUCTION OF LEVEE section 2.1 A. (1) Impervious Fill Materials, prior to placement on the levee.

Def.'s App. at A1616, ECF No. 119-4.

There were also new drawings provided in the Amended Solicitation. On the new drawings a "cloud" was placed around particular illustrations where IBWC wished to highlight parts of the original drawings that were affected by Addendum 1. For example, a "cloud" was drawn around the entire diagram of the levee in Typical Section 8, with the number "1" placed beside the cloud inside a triangle. Def.'s App. at A1633, ECF No. 119-4. This signified that the entire drawing was subject to Addendum 1 (i.e., the Amended Solicitation). Tr. of Oral Arg. ("Tr.") at 28–30, ECF No. 138.

## C.   UC Submits Its Bid

Mr. Guzman had read the original drawings for Typical Sections 7, 8, and 9 to require "rebuilding a major portion of the levee." Pl.'s Mot. Ex. 57 ¶ 7. He concluded, however, that as a result of the new paragraph in specification 00.31.19—stating that "[a]pproximately 232,300 tons of impervious material has been placed on the levee and may be suitable embankment at the contractor's discretion"—"the character of the work required in the IBWC Rehab area had been changed dramatically." Pl.'s Mot. at 19. Instead of "completely rebuilding the levee as originally specified," Mr. Guzman inferred, the contractor would now be required "to simply bench[] and rais[e] the levee to the specified elevation (if IBWC had not already done so)." Id.

Mr. Guzman understood the new paragraph to address questions posed verbally during the site visit about whether the existing embankment that the in-house crews had rehabilitated could be left in place. Specifically, he believed that the new language signaled "that IBWC's work [in 2009] was 'suitable' meaning it was properly done." Pl.'s Mot Ex. 57 ¶ 14. Therefore, Mr. Guzman concluded that UC "could generally leave this section of the levee in place and would only have to do limited benching and filling in order to meet the specified final elevations, plans and profile, to the extent IBWC had not already done so." Id.

In light of this understanding, UC revised its proposed prices for CLIN 10 ("embankment") by reducing the unit price of $11.85 to $3.50, which resulted in a reduction of the total price for CLIN 10 from $6,949,100.70 to $2,052,477.00. Pl.'s Mot. Ex. 46, ECF No. 107-4; Guzman Dep., Pl.'s Mot. Ex. 38 at 104, ECF No. 107-3. The revised total price of $2,052,477.00 for CLIN 10 became part of UC's final bid price of $9,249,621.57. Pl.'s Mot. Ex. 46; Pl.'s Mot. Ex. 38 at 104.

### D.    UC Is Awarded the Contract

According to the Engineer's Analysis of Contractor Bids prepared by S&B for IBWC, the government received thirteen eligible bids on September 2, 2010. Pl.'s Mot. Ex. 9, ECF No. 107-2. UC was the apparent lowest bidder. Id. UC's bid was approximately $1 million lower than the next highest bid of $10,220,632.30. Id. The overall highest bid was $19,887,767.83, and the Engineer's Construction Estimate was $22,601,094. Id.

IBWC awarded the contract to UC on September 13, 2010.[3] Pl.'s Mot. at 19. A notice to proceed was issued on September 28, 2010 and a "Notice to Proceed Meeting" was held on the same day. Pl.'s Mot. Ex. 19, ECF No. 107-2; Ex. 50, ECF No. 107-4.

### E.    IBWC Requires UC To Completely Remove Material UC Believed Could Be Left in Place Under the Terms of the Amended Solicitation

As discussed above, after the Amended Solicitation was issued, UC interpreted the new paragraph in specification 00.31.19 to allow it to leave in place the existing embankment. It sought confirmation of this understanding at a project meeting held on January 11, 2011. Specifically, the minutes of the meeting reflect that UC asked "if the material in place passed density and proctor test could they leave it in place." Pl.'s Mot. Ex. 53, ECF No. 107-4. IBWC representatives responded by instructing UC to submit the question as a Request for Information ("RFI"). Id.

Almost two months later, on March 7, 2011, UC submitted RFI #109. The RFI concerned the definition of the word "embankment" used in CLIN 10.[4] Pl.'s Mot. Ex. 54, ECF No. 107-4. UC asked if the term "embankment" meant "finish in place product" with all costs related thereto. Id. IBWC responded: "Yes. As per specification 35.41.00, 4.2 Payment, incidentals are included and listed." Id.

At a meeting held on March 31, 2011, IBWC advised UC that—contrary to UC's stated understanding of its obligations—Typical Sections 7, 8, and 9 of the levee had to "remain per

---

[3] The contract award notice was dated September 10, 2010 (Pl.'s Mot. Ex. 60, ECF No. 107-4), but it appears from the record that UC received notice of the award on September 13. In any event, the exact date of the award is not material to the disputed issues in this case.

[4] UC asserts that the RFI "request[ed] confirmation of UC's understanding of the term embankment as used in specification 00.31.19." Pl.'s Mot. at 20. But the RFI did not cite specification 00.31.19; it cited only specification 35.41.00 (which concerns payment) and CLIN 10. Pl.'s Mot. Ex. 54.

plans." Pl.'s Mot. Ex. 55, ECF No. 107-4. In other words, according to IBWC, UC was required by the contract to excavate the existing material in the sections and rebuild them; it did not have the option of leaving in place the material that the IBWC in-house crews had left there as part of their 2009 rehabilitation project. See id. The agency gave three reasons for this instruction: (1) that the Commission had stated on the public record that these areas would be reconstructed; (2) that IBWC was not comfortable with the density of the existing embankment and that not enough testing had been performed on it; and (3) that S&B would not warrant the design without reconstruction. Id.

### F.    Request for Equitable Adjustment

UC submitted a request for equitable adjustment ("REA") on April 11, 2011 in response to IBWC's interpretation of UC's performance obligations for Typical Sections 7, 8, and 9. Pl.'s Mot. Ex. 56, ECF No. 107-4. In it, UC requested a contract modification on the grounds that UC, "as a prudent bidder," had reasonably interpreted the Solicitation to provide that "[a]ll material in typical embankment section 7, 8 and 9 was suitable embankment and could be left in place." Id.

IBWC did not agree to a modification or any equitable adjustment. See Pl.'s Mot. Ex. 11 at 7–11, ECF No. 107-2 (request for final contracting officer's decision concerning request for equitable adjustment, dated October 30, 2013). Accordingly, UC completed the work as instructed and tracked the resulting costs. Id.

### III.   Factual Background of UC's Defective Specifications Claim

### A.    IBWC Learns That Its Survey Data Is Unreliable

UC's Defective Specifications claims have their genesis in surveys that were performed during 2009 and the first half of 2010 by IBWC's contractor S&B and/or its subcontractors. It is undisputed that, by at least May 2010—if not earlier—S&B and IBWC were aware that there were various discrepancies in the survey data for the "CE2" reach (section) of the levee, which included Typical Sections 7, 8, and 9. See Pl.'s Mot. Ex. 35 (original Solicitation drawings); Pl.'s Mot. Ex. 63, ECF No. 107-4 (Amended Solicitation drawings).

Thus, on May 19, 2010, representatives from S&B and IBWC participated in a conference call to discuss the survey data. Pl.'s Mot. Ex. 13 at 1, ECF No. 107-2. The transcript of the call reveals that the representatives discussed S&B's discovery that some of the "original centerline [right-of-way] monuments," were missing and had been "removed or destroyed." Id. at 2–3. Colleen Elliott, the contracting officer for S&B's design-services contract, explained that the centerline monuments had been removed in 2009 when the IBWC in-house crew was working on the levees. Id. at 3. This was problematic because such monuments are "critically important survey markers used for marking the rights-of-way and centerline of the existing levee." Pl.'s Mot. at 8.

By late July 2010—as the Solicitation was being finalized and issued—IBWC had not yet received the right-of-way survey report from S&B. See Email from Guillermo Martinez to IBWC Staff Members dated July 28, 2010, Pl.'s Mot. Ex. 16, ECF No. 107-2 (The Solicitation and other "projects [were] already out for bid, and IBWC [would] need to provide the [right-of-way] survey reports to the winning bid contractors."). Thus, when the Solicitation was first

published on August 2, 2010, a relatively limited amount of information was provided regarding the survey and rights of way in specification 00.31.21. See Pl.'s Mot. Ex. 17, ECF No. 107-2. In the Amended Solicitation published on August 27, 2010, information from "supplemental surveys" performed by S&B subcontractor Del-Mont Consultants, Inc. was added "in order to account for USIBWC levee 'in-house work' that was not reflected on the original [survey reports]." Pl.'s Mot. Ex. 18, ECF No. 107-2.

IBWC has conceded that it was aware that there were "[a]ll kinds of" survey issues as S&B's design work progressed during the first eight months of 2010. Dep. of Colleen Elliott, Pl.'s Mot. Ex. 25 at 38, ECF No. 107-3. As Ms. Elliott explained during her 2016 deposition:

> The original markers that they placed for the aerial, there was something wrong on the communication. I don't know what. The whole Upper Rio Grande was misoriented as a result. . . . We rejected the survey. Then [S&B] re-performed the entire survey, in excess of a million dollars, at their own cost.

Id. at 39.

Boundary and Realty Officer Duane Price, who began working at IBWC on or about August 23, 2010 (a few weeks after the Solicitation was issued), similarly acknowledged that IBWC was aware that the survey data was defective during the solicitation period. Dep. of Duane Price, Pl.'s Mot. Ex. 26 at 10, ECF No. 107-3. He testified that he immediately "began to become aware of the fact that we had a boundary retracement of the IBWC boundaries or rights of way that could not be relied upon." Id. As Mr. Price explained, "retracing" involves "recovering and determining the locations of existing right-of-way monuments, corners—a monument being a physical object; a corner being the imaginary location by design." Id. at 11. According to Mr. Price, "there were four survey companies that had worked for S&B infrastructure prior to [Mr. Price] coming to work for the Boundary Commission and [they] attempted to retrace the footsteps of the original boundary survey. And in doing so, they did not do it correctly." Id.

The boundary retracement was not completed by the time of the contract award to UC in September 2010. Id. In fact, Mr. Price testified during his June 2016 deposition, the survey issues "ha[d] not been resolved to date in terms of the boundary." Id. at 30.

## B.    UC Begins Performance and Raises Concerns About the Accuracy of the Survey Data

On September 28, 2010, a few weeks after the contract was awarded, a notice-to-proceed meeting was held. Pl.'s Mot. Ex. 19, Ex. 50. At that meeting, Mr. Guzman requested that IBWC provide UC with "all Surveying Data that was used for the development of this project." Pl.'s Mot. Ex. 19.

UC's subcontractor, Brock & Bustillo ("B&B"), began layout work within a day or two of receiving the notice to proceed. Pl.'s Mot. at 8. Almost immediately, B&B discovered several problems and inconsistencies in the contract survey data. Id. Among other things, B&B was unable to find a number of the monuments. Id.

On October 6, 2010, a "Mutual Understanding Conference" was held with representatives from UC, Tetra Tech (hired as IBWC's onsite "representative"), B&B, and IBWC. See Pl.'s Mot. Ex. 20, ECF No. 107-2. Meeting participants, including Mr. Guzman and Mr. Price, discussed a number of topics, including the discrepancies between a 1938 survey and the 2010 S&B survey. See Pl.'s Mot. Ex. 21, ECF No. 107-3. IBWC had previously made the latter survey available to UC, but not the former.

After the October 6 meeting, UC submitted RFI #004. It observed that "[a]t today's Survey Meeting 10-06-2010 it was stated that the existing survey of 2010 was incorrect and that the designer should have used the Control data established in 1937." Pl.'s Mot. Ex. 22, ECF No. 107-3. It then posed a question: "Can the Control Survey Data from 1937 be made available for this contract?" Id.

On October 12, 2010, IBWC, through Contracting Officer Representative ("COR") Rosie Montes, responded to RFI #004, as follows:

> Existing Survey of 2010 was transmitted to Ultimate Concrete on 10/07/10 for the recovery of centerline monumentation. Contractor shall verify any data received. The Control Survey Data from 1937/38 is being gathered by USIBWC [and] is expected to be submitted to UC by end of this week. 1937/38 data received will need to be verified by contractor and used for the construction of this project. USIBWC Boundary Realty Officer wishes to meet with Contractor's surveyor upon receipt of this information.

Id. (emphasis supplied).

After Ms. Montes provided this response (and unbeknownst at the time to UC), she spoke with IBWC lead engineer Isela Canava. Ms. Canava summarized their discussion in an email which stated as follows:

> As discussed yesterday, do not provide this additional information to the Contractor. All the information that the Contractor needs to complete the construction work should be included in the plans and specifications. If there is an error in the information or information is lacking, Contractor should submit an RFI, which will need to be forwarded to the designer.
>
> If we were to provide the information noted below and the Contractor were to use it, we may be assuming some liability in the survey work during construction.

Email from Ms. Canava to Ms. Montes dated October 14, 2010, Pl.'s Mot. Ex. 23, ECF No. 107-3.  Ms. Montes modified her response to RFI #004 accordingly, revising it to state:

> This response amends previous response based on original scope of work and conformed construction documents in Contractor's possession. Contractor is to use S&B conformed construction documents for construction. Any deviations or deficiencies are to be documented and submitted to USIBWC for analysis.

Pl.'s Mot. Ex. 24, ECF No. 107-3.

### C.   Impact of Defective Survey Data

As instructed in the response to RFI #004, when UC ran into problems related to the survey data, it submitted RFIs to IBWC, which then forwarded the RFIs to S&B. Pl.'s Mot. at 11. Reports submitted by Tetra Tech reflect that UC raised issues related to the defective survey data multiple times during the fall of 2010. See Government Inspector's Reports dated October 21, November 2, November 10, and November 13, 2010, Pl.'s Mot. Ex. 27, ECF No. 107-3. In the November 13 report, the inspector wrote: "Contractor has relocated workers and equipment to the staging area to perform maintenance until the surveyors complete their survey." Id.

On December 7, 2010, IBWC Acquisition Division Chief Hugo White sent an email to IBWC staff assigned to the Project. He referenced a progress meeting held that day and observed that there were "97 outstanding RFIs – most impacting the critical path. Included are the many encroachment issues holding up the job – what have you done to get the ae [sic] to move on these issues?" Pl.'s Mot. Ex. 28, ECF No. 107-3.[5] Later the same day, December 7, Mr. White stated that the agency would be writing "a strong letter" to S&B regarding the issues and apparent delays arising out of the survey problems. Pl.'s Mot. Ex. 29, ECF No. 107-3.

On January 19, 2011, IBWC, Tetra Tech, and UC representatives met to discuss the outstanding RFIs. See Pl.'s Mot. Ex. 30, ECF No. 107-3. The representatives agreed that "S&B would no longer be relied upon for answers." Pl.'s Mot. at 11–12 (citing id.). Instead, "[w]hen a survey conflict was identified in the field, UC and [Tetra Tech] were given authority to determine a solution without waiting for S&B, and to obtain approval from the COR." Id. at 12.

As a result of this new approach, according to UC, the survey discrepancies no longer impeded its progress on the Project. The Project was completed on or about November 15, 2012. Am. Compl. ¶ 85, ECF No. 12.

## IV.   UC's First Certified Claim

On October 30, 2013, UC filed a request for a final contracting officer's decision ("FCOD") in connection with its certified claims, including its REA 7-8-9 and its Early Delays claim. See Pl.'s Mot. Ex. 11. UC later transmitted all of the supporting information electronically, as required by the contracting officer. Am. Compl. ¶ 16; Am. Answer ¶ 16, ECF No. 14. The first certified claim requested approximately $13.4 million in equitable adjustments, including $10,354,216.06 allocated to the REA 7-8-9 claim and $391,724.30 allocated to the Early Delays claim. Pl.'s Mot. Ex. 11.

On or about February 18, 2014, IBWC notified UC that it required an additional sixty days to adjudicate the certified claim due to a change in the responsible contracting officer. Am. Compl. ¶ 19; Am. Answer ¶ 19. On May 5, 2014, UC notified the contracting officer that, absent the issuance of a final decision by May 9, 2014, it would consider its request denied pursuant to

---

[5] "Critical path" refers both to a method of schedule analysis and to a group of activities on a project that must be completed on a certain timeline to keep the project on schedule. See Wilner v. United States, 23 Cl. Ct. 241, 244–45 (1991).

41 U.S.C. § 7103(f)(5). Am. Compl. ¶ 20. The contracting officer did not respond by May 9, 2014, nor has any FCOD been issued since. Am. Compl. ¶ 21; Am. Answer ¶ 21.

## V.      UC's Action in This Court and Its Second Certified Claim

UC filed its complaint in this court on June 27, 2014. ECF No. 1. In the meantime, UC filed a second certified claim on or about December 22, 2014. Pl.'s Mot. to File Am. Compl. ¶ 2, ECF No. 11.[6] When UC did not receive a decision within sixty days, it notified the contracting officer that, as before, it considered its claim denied and intended to add an appeal of that denial to this action. Id. ¶ 5. With the approval of the court and unopposed by the government, UC filed its amended complaint, which included the appeal of the denial of the second certified claim, on May 1, 2015. ECF No. 12.

## VI.     The Cross-Motions for Summary Judgment

Following discovery and the reassignment of the case to the undersigned, UC filed a motion for summary judgment on April 27, 2018. ECF No. 107. UC has moved for summary judgment on liability only as to its Defective Specifications claim and its REA 7-8-9 claim.

In response to UC's motion, the government filed a cross-motion for summary judgment on essentially the same two claims identified by UC, although it limited its motion on the Defective Specifications claim to the Early Delays subpart of the claim. ECF No. 119. Both parties have filed additional briefs in reply and response to the opposing party's motions. ECF Nos. 128–29.

UC's REA 7-8-9 claim is based on the constructive change doctrine. It alleges that it was required to perform certain work that was beyond the scope of the contract. The resolution of this claim turns entirely on the proper construction of a sentence added to specification 00.31.19 by Addendum 1, which stated that "[a]pproximately 232,300 tons of impervious material has been placed on the levee and may be suitable embankment at the contractor's discretion." Def.'s App. at A1090. For the reasons set forth below, the Court agrees with the government that there was no constructive change that altered the scope of the contract. It therefore grants the government's motion for summary judgment as to this claim.

On the other hand, the Court finds that UC is entitled to summary judgment as to the government's liability on its Defective Specifications claim. It is undisputed that the government knowingly provided defective survey data to UC and then failed to take action to correct the error for several months.

---

[6] The damages sought in the second certified claim are irrelevant to the parties' present cross-motions.

The government has moved for summary judgment on UC's Early Delays claim, which—as mentioned above—is related to the defective-specifications allegations. The parties' briefing and oral argument on the cross-motions reveal that there remain disputed issues of material fact as to this claim—and in particular, the government's "critical path" defense. Therefore, it is premature to resolve this claim on summary judgment as the government has requested.

## DISCUSSION

### I.    Jurisdiction

The Tucker Act grants the United States Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a). Further, the Court has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 [i.e., the Contract Disputes Act]." Id. § 1491(a)(2). The CDA applies to, inter alia, "the procurement of construction, alteration, repair, or maintenance of real property." 41 U.S.C. § 7102(a)(3).

Before the Court may review a claim by a contractor, the CDA requires the contractor to have (1) submitted to the contracting officer a valid claim within the meaning of FAR 2.101, certified if the amount requested is more than $100,000, and (2) received from the contracting officer a final decision on that claim. 41 U.S.C. § 7103; M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327 (Fed. Cir. 2010). These requirements are jurisdictional. Id. at 1328.

Here, UC asserts contract claims arising out of a contract with IBWC for construction and related services intended to improve the levee. Thus, the jurisdictional "hook" set forth in § 7102(a)(3) applies here. UC presented a certified claim regarding its request for equitable adjustment, the alleged "Early Project Delays," and other issues to the contracting officer on October 30, 2013. Pl.'s Mot. Ex. 11. Because more than sixty days passed without an FCOD, UC considered its certified claim denied as of May 5, 2014, pursuant to 41 U.S.C. § 7103(f)(5). Pl.'s Mot. at 5. As described above, UC later amended its complaint to include additional claims supported by its second certified claim, which it submitted in December 2014. As with the first certified claim, no FCOD was ever issued for the second certified claim, and it was also deemed denied under § 7103(f)(5). For these reasons, the Court has subject-matter jurisdiction over the claims alleged in UC's complaint and amended complaint pursuant to the Tucker Act and the CDA.

### II.    Standards for Motions for Summary Judgment

The standards for granting summary judgment are well established. Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Rules of the Court of Federal Claims ("RCFC") 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

"The moving party bears the burden of establishing the absence of any genuine issue of material fact," and all significant doubts regarding factual issues must be resolved in favor of the party opposing summary judgment. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." Id. at 1391. Further, the court should act with caution in granting summary judgment and may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

## III.    The REA 7-8-9 Claim

In its REA 7-8-9 claim, UC seeks an equitable adjustment of the contract price based on the constructive change doctrine. It contends that a constructive change occurred when IBWC instructed it to excavate the existing embankment material in Typical Sections 7, 8, and 9 down to the benching lines set forth in the contract drawings and then rebuild the embankment, raising its height to meet contract specifications. According to UC, under the terms of the contract as reflected in Addendum 1 to the Solicitation, it had the discretion to not excavate the existing embankment but to instead leave in place the material IBWC's in-house crews installed during their 2009 rehabilitation project.

For the reasons set forth below, the Court concludes that UC's interpretation of its obligations under the contract is not reasonable. The excavation work that IBWC directed it to perform was unambiguously within the scope of the contract. Accordingly, the government is entitled to summary judgment as to UC's REA 7-8-9 claim.

### A.    Applicable Legal Principles

"A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the Government." Int'l Data Prods. Corp. v. United States, 492 F.3d 1317, 1325 (Fed. Cir. 2007); see also FAR 52.243-4 (2007) (changes clause); Def.'s App. at A2201, ECF No. 119-7 (incorporating FAR 52.243-4 by reference into contract). To prevail on a constructive change claim and secure an equitable adjustment, a contractor must show that an official with authority to bind the government demanded "work above and beyond that in the contract." Agility Def. & Gov't Servs. Inc. v. United States, 115 Fed. Cl. 247, 251 (2014) (citing Int'l Data Prods., 492 F.3d at 1325); see also Ace Constructors, Inc. v. United States, 499 F.3d 1357, 1361 (Fed. Cir. 2007). Therefore, where the government requires performance consistent with contract specifications and/or mandates that a contractor correct nonconforming work, no adjustment is warranted. NavCom Def. Elecs., Inc. v. England, 53 F. App'x 897, 900 (Fed. Cir. 2002) (citing S.S. Silberblatt Inc. v. United States, 433 F.2d 1314, 1323 (Ct. Cl. 1970)); see also Len Co. & Assocs. v. United States, 385 F.2d 438, 443 (Ct. Cl. 1967) ("In all cases, the contracting officer, as part of his duty to assure compliance by the contractor with the plans and specifications, has the power to order the work done in a manner which is reasonable and proper.").

It is well established that contract interpretation "begin[s] with the plain language" of the contract. <u>McAbee Constr. Inc. v. United States</u>, 97 F.3d 1431, 1435 (Fed. Cir. 1996); <u>see</u> <u>also</u> <u>SUFI Network Servs., Inc. v. United States</u>, 785 F.3d 585, 593 (Fed. Cir. 2015). Courts must "interpret the contract in a manner that gives meaning to all of its provisions and makes sense." <u>McAbee Constr.</u>, 97 F.3d at 1435; <u>see also</u> <u>Blake Constr. Co. v. United States</u>, 987 F.2d 743, 746–47 (Fed. Cir. 1993) ("An interpretation which gives reasonable meaning to all parts of a contract is preferred to one which renders part of it insignificant or useless."); <u>Medlin Constr. Grp., Ltd. v. Harvey</u>, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (A reasonable interpretation of a contract "assure[s] that no contract provision is made inconsistent, superfluous, or redundant."); <u>Abraham v. Rockwell Int'l Corp.</u>, 326 F.3d 1242, 1251 (Fed. Cir. 2003) ("Under general rules of contract law we are to interpret provisions of a contract so as to make them consistent."); <u>Air–Sea Forwarders, Inc. v. United States</u>, 166 F.3d 1170, 1172 (Fed. Cir. 1999) (observing that "an agreement is not to be read in a way that places its provisions in conflict, when it is reasonable to read the provisions in harmony").

### B.     UC's Interpretation of the Contract Is Unreasonable

In this case, the parties contest the meaning (and implications) of the last sentence of the second paragraph of specification 00.31.19, which was added to the contract as part of Addendum 1. To reiterate, that provision informed bidders that "[a]pproximately 232,300 tons of impervious material has been placed on the levee and may be suitable embankment at the contractor's discretion." Def.'s App. at A1090. According to UC, the phrase "may be suitable embankment at the contractor's discretion" meant that the contractor was not required to remove the referenced 232,300 tons of impervious material left as embankment by IBWC's in-house crews in 2009. The government, on the other hand, argues that the operative sentence must be read in light of the entire contract, which obliged UC to excavate the existing embankment down to the benching lines set forth in the contract plans. The language upon which UC relies, the government argues, merely acknowledges that the contractor may salvage and reuse material from the existing embankment as fill <u>after</u> excavating it.

For the reasons set forth below, the government's interpretation of the operative sentence is consistent with its language and with the contract read as a whole. UC's interpretation, on the other hand, ignores portions of the operative sentence and places it in conflict with both the specifications governing the construction of the levee and the contract drawings. The Court concludes, therefore, that the only reasonable reading of the contract is the one proffered by the government.

The Court begins its analysis with the specifications governing the construction of the levee set forth in both in the original and amended Solicitation. They state in pertinent part that "excavation shall consist of removal to the lines and grades shown on the plan sheets" and that "[f]ill shall be placed to the lines and grades and within the appropriate fill zone as indicated within the plans." Def.'s App. at A291, A293, ECF No. 119-1. The specifications also provide that the contractor was permitted to reuse salvaged material excavated from the existing levee. <u>Id.</u> at A1273.

UC's interpretation of the operative sentence cannot be reconciled with these specifications. As depicted below in the original drawing of Typical Section 8, for example, the plans contained benching lines that set forth the depth to which the contractor was required to excavate.[7] The drawings also included shaded or diagonally-striped areas representing the "reusable" clay material that was placed by the IBWC in-house crews in 2009.[8]



Def.'s App. at A665 (portion of original Typical Section 8 drawing, omitting notes in right margin).

Significantly, the reusable clay material was separated from the benching lines by a layer of sand and sandy silts. Id. at A2599–600 (testimony of UC expert). As UC's expert testified, in

---

[7] "Benching" is the process of cutting stair-step horizontal planes into an existing levee to prepare it for the addition of more material (fill) to build up the levee. Magnus Pac. Corp. v. United States, 133 Fed. Cl. 640, 679 (2017) (defining "benching"); see also Pl.'s Mot. Ex. 57 ¶ 6. On the drawings, a solid "stair-step" line near the bottom of the levee illustrated the applicable "bench excavation limits." See Def.'s Mot at A664–66; A2598, A2600–01, ECF No. 119-9 (according to plaintiff's expert Dr. Costigan, the "benching limit," not the dotted "minimum benching line," indicates the depth to which the contractor was required to dig).

[8] This shaded or diagonally-striped portion of the levee was labeled "approx. limits of reusable material." See Def.'s Mot at A664–66, A2599–601, A2628. Note (5) on each of the drawings for Typical Sections 7, 8, and 9 also stated that the "top portion of the bench excavation material may be reused for embankment." Id. at A664–66; see also Pl.'s Mot. Ex. 35.

order to excavate down to the prescribed benching lines and then rebuild the embankment to the required height, the contractor would necessarily have to excavate and remove the existing clay that had been placed there in 2009 by the IBWC in-house crews. Id. at A2601 ("Q. [H]ow could Ultimate Concrete replace that area from the benching line to the shaded area without digging up the shaded area? A. They could not."). Indeed, Mr. Guzman has acknowledged that the original specifications and plans for Typical Sections 7, 8, and 9 required "rebuilding a major portion of the levee"—i.e., they required the contractor to excavate the existing embankment and rebuild a new one up to the heights specified in the plans. Pl.'s Mot. Ex. 57 at ¶ 7.

The Court is not persuaded that the new language added in Addendum 1 upon which UC relies—stating that the "[a]pproximately 232,300 tons of impervious material . . . placed on the levee" by IBWC's in-house crews in 2009 "may be suitable embankment at the contractor's discretion"—was intended to relieve the contractor of the obligation to excavate the existing embankment. Thus, UC's argument is based primarily on the theory that the term "suitable embankment" necessarily refers to an "embankment" that is a finished structure. So construed, UC argues, the operative sentence supplied by Addendum 1 allowed it to treat the embankment that the in-house crews built in 2009 as "suitable." In its view, under the amended language, it could leave that existing "suitable" embankment in place and would only be required to add more fill that would raise the embankment to the level specified in the plans.

UC's interpretation of the operative sentence places it at odds with the specifications and drawings, which necessarily required it to excavate down to the benching lines. Further, as shown below in the reproduction of the amended version of Typical Section 8, the benching lines remained at the same depth and in the same location on the revised drawings. Tr. at 29 (UC's counsel stating that "[t]here is literally no change between this detail and that detail, other than the new detail is within the cloud [and] they've added the station numbers here").[9]

---

[9] Although the drawing for Typical Section 7 had clouds only around discrete portions of the diagram, Typical Sections 8 and 9 represented the vast majority of the portion of the levee at issue with respect to the REA 7-8-9 claim. See Def.'s App at A1632, ECF No. 119-4 (amended Typical Section 7 drawing); Tr. at 29–30 (UC's counsel explaining that Typical Section 7 represented only about 300 lineal feet of the levee as opposed to almost six miles represented by Typical Section 8). The drawings for both Typical Sections 8 and 9 showed a cloud around the entire diagram. See Def.'s App. at A1633–34.



Def.'s App. at A1633 (amended drawing of Typical Section 8, omitting notes on right side of page).

As noted above, in the revised drawings, changes were reflected by placing a "cloud" around any portion of the drawing that was subject to modification by Addendum 1. As shown above, Typical Section 8's plan, for example, included a cloud drawn around the entire original drawing. Compare Typical Section 8 Drawing at Pl.'s Mot. Ex. 35 with Typical Section 8 Drawing at Pl.'s Mot Ex. 63; see also Tr. at 29. The effect of the cloud was to refer prospective bidders back to the revised language in the amended specifications. Tr. at 30 (UC's counsel stating "[t]hey didn't change anything[, o]ther than they added the words in the specification"); see also Pl.'s Mot. at 34–35. The clouds themselves, however, did not independently signal material changes in the scope of work.

On the other hand, the government's reading of the operative sentence comports with its plain language and harmonizes it with the rest of the contract. The subject of the sentence is the "232,300 tons of impervious material" that had already been "placed on the levee." It is that material which "may be suitable embankment." But while UC would treat the word "embankment" as a noun, the absence of a preceding article (i.e., "a" suitable embankment) indicates that the word "embankment" was not being used as a noun in the operative sentence. Instead, the word "embankment" was being used as a verb, which is defined as "the action or process of embanking," which in turn means to "confine (as a stream) by means of embankments." Webster's Third New Int'l Dictionary 738 (unabridged ed. 1993). The word "suitable" in this context is not an adjective; it is an adverb that means "in a suitable manner." Id. at 2286. Thus, a sentence stating that the specified material "may be suitable embankment" can be read to mean that the specified material may be suitable for use to confine or hold back the river.

Moreover, UC's construction of the operative sentence is implausible because it renders its final clause without purpose. If, as UC contends, IBWC intended to authorize the contractor to leave the existing structure in place because it was a "suitable embankment," then it is unclear what purpose was served by stating that the material "<u>may be</u> suitable embankment <u>at the contractor's discretion</u>." After all, what was left for the contractor to decide, IBWC having deemed the existing embankment "suitable"?

Under the government's reading of the sentence, on the other hand, the final clause has a clear purpose. It affords the contractor the discretion to salvage and use the existing material after it performs the excavation, or it may decide to instead use material from other sources.

The government's reading is also strongly supported by text that was added to the "General Notes" section of the drawings by Addendum 1. The notes explain that the "[e]xisting levee embankment shown in Typical Sections VII, VIII & IX contains approximately 232,300 tons of previously placed material which may be suitable embankment material" and that "[a]ll embankment material shall meet the requirements of specification 35 41 00 . . . prior to placement on the levee." Def.'s App. at A1616 (amended drawing notes with quoted portion encased in a cloud to indicate addition as part of addendum). It is evident that the 232,300 tons of material referenced in the General Notes is the <u>same</u> 232,300 tons of "impervious material" that is described in 00.31.19. And it is also evident that the notes contemplated that this material would be excavated, reviewed for compliance with specification 35 41 00, and then, if compliant, "place[d] on the levee" at the contractor's discretion.

Further, UC's view that the operative sentence dramatically reduced its obligation to excavate the existing embankment down to the benching lines is also implausible in light of the final versions of CLINs 9 and 10. As explained above, CLINs 9 and 10 call for "excavation" (CLIN 9) and "embankment" (CLIN 10) of certain estimated quantities of material. If UC's interpretation were correct, then the original estimates of the quantities of materials to be removed and to be placed should have been reduced by some 232,000 cubic yards in the Amended Solicitation. But instead, the total volume of material estimated to be excavated and placed on the levee actually <u>increased</u> slightly. <u>See</u> Def.'s App. at A1059, ECF No. 119-4 (CLINs 9 and 10 increase by 5,977 cubic yards and 1,635 cubic yards to totals of 388,160 and 586,422 cubic yards, respectively).

UC's remaining arguments lack merit. First, its reliance on the order of precedence clause contained at FAR 52.236–21, which is incorporated by reference into the contract, is unavailing. That provision states that where there is a "difference between drawings and specifications, the specifications shall govern." As set forth above, the Court's interpretation of specification 00.31.19 (unlike UC's) ensures that it is <u>consistent</u> with the rest of the contract—including the drawings. The order of precedence clause is accordingly inapplicable.

Similarly, the Court is not persuaded by UC's discussion of Mr. Guzman's subjective interpretation of the language at issue or its argument that it was unfair for IBWC to make what it calls "sweeping 'last minute' changes" to the specifications that it alleges were contained in Addendum 1. For the reasons set forth above, it is the Court's view that Addendum 1 did not making sweeping changes to the contract; instead, in response to written questions posed by

prospective bidders, it clarified that the contractor would be able to make use of salvaged clay material to construct the levee.

UC also suggests that the phrase "suitable embankment" has a specialized meaning to persons experienced in the construction of levees, and that to such persons "the phrase 'may be suitable embankment at the contractor's discretion' unambiguously means that the newly rehabilitated work could be left in place and used to support the construction of the added height to the levee, if the IBWC Rehab had not already added it." Pl.'s Mot. at 32.

To be sure, evidence concerning trade usage and practice "may be useful in interpreting a contract term" with a specific, "accepted industry meaning different from its ordinary meaning— even where the contract otherwise appears unambiguous—because the 'parties to a contract . . . can be their own lexicographers and . . . trade practice may serve that lexicographic function in some cases.'" Hunt Constr. Group, Inc. v. United States, 281 F.3d 1369, 1373 (Fed. Cir. 2002) (quoting Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000)). But beyond assertion, UC supplies no evidence that the phrase "may be suitable embankment at the contractor's discretion" has any specialized industry meaning, much less the meaning that UC ascribes to it. In fact, it supports its interpretation of the language by citation to standard dictionary definitions of the word "suitable" and the word "embankment." Pl.'s Mot. at 32. It also cites the manual of the United States Corps of Engineers which defines a "levee," in pertinent part, as "an embankment whose primary purpose is to furnish flood protection from seasonal high water." Id. While the noun "embankment" is synonymous with the noun "levee" (i.e., a structure) in the context of defining the latter, that is far from evidence that the phrase "may be suitable embankment" has some specialized meaning in the industry. Therefore, "the contract's unambiguous terms govern." Hunt Constr. Grp., 281 F.3d at 1373.[10]

In short, UC's constructive change argument lacks merit. The government is accordingly entitled to summary judgment as to UC's REA 7-8-9 claim.

## IV.     Defective Specifications Claim

The second topic of the parties' cross-motions for partial summary judgment is UC's Defective Specifications claim. UC alleges that IBWC provided it with contract survey data that the agency knew was unreliable, and that IBWC failed to correct the defects in a timely manner. Pl.'s Reply in Supp. of Mot. for Summ. J. & Resp. to Def.'s Counter Mot. for Summ. J. ("Pl.'s Reply") at 3, ECF No. 128. As a result, UC alleges, its progress on the Project was delayed between the time the notice to proceed was issued and January 18, 2011. UC seeks damages for these delays, but requests that the Court rule in its favor as to liability only at the present time.

---

[10] Because there is no evidence that the language of the operative sentence has any specialized meaning in the industry, the Court finds irrelevant the interpretation of the language articulated by UC's expert Dr. Costigan (Pl.'s Mot. at 34–35). See Sparton Corp. v. United States, 77 Fed. Cl. 1, 8 (2007) ("In the absence of specialized trade usage, expert testimony regarding proper contract interpretation is inadmissible, as is expert testimony regarding the legal significance of the contract language.") (citations omitted).

In response, the government has also moved for partial summary judgment. It acknowledges that "UC may have a claim or claims arising from defective survey plans," but contends that any such claim or claims cannot result in an award of damages for any "early delays." Def.'s Mot. at 46. According to the government, it is entitled to summary judgment as to the $382,714.30 in delay damages UC seeks because the defective survey data did not cause any delays in activities on the "critical path" to the completion of the contract.

For the reasons set forth below, the Court concludes that the material facts are not in dispute and that UC is entitled to summary judgment as to liability on its Defective Specifications claim. On the other hand, it denies the government's cross-motion for summary judgment, finding that the facts underlying the Early Delays damages claim are in dispute and that the better course is to proceed to trial as to that claim.

A.  **UC's Motion for Partial Summary Judgment as to Liability for Defective Specifications**

It is well established that "[w]hen the government provides a contractor with defective specifications, the government is deemed to have breached the implied warranty that satisfactory contract performance will result from adherence to the specifications, and the contractor is entitled to recover all of the costs proximately flowing from the breach." Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1289 (Fed. Cir. 2000); see also United States v. Spearin, 248 U.S. 132, 136 (1918); Franklin Pavkov Constr. Co. v. Roche, 279 F.3d 989, 994–95 (Fed. Cir. 2002). The compensable costs include, among other things, those "attributable to any period of delay" resulting from the defective specifications. Essex Electro, 224 F.3d at 1289.

Here, the undisputed facts outlined above show that the survey data IBWC provided to UC was defective. Further, the undisputed facts also show: (1) that the government knew the survey data was inaccurate even before it opened the contract up for bidding; and (2) that it knew that a number of the inaccuracies were the result of actions taken by IBWC's own work crews during the 2009 rehabilitation project. In addition, when UC identified the defects during the fall of 2010—after it began performance—IBWC deliberately withheld more accurate survey data. Finally, it is not disputed that the process IBWC initially established to resolve survey discrepancies was an ineffective one. The Court concludes, therefore, that UC is entitled to summary judgment as to liability on its Defective Specifications claim.

B.  **Government's Motion for Partial Summary Judgment as to UC's Claim for Early Delay Damages**

The government does not contest that it is liable for any damages proximately flowing from the defective survey data. Nonetheless, it moves for summary judgment as to one component of UC's claim for damages—those based on alleged "early delays" in UC's work on the Project from September 2010 through January 2011.

When a contractor seeks an equitable adjustment for government-caused delay, "the contractor has the burden of proving the extent of the delay, that the delay was proximately caused by government action, and that the delay harmed the contractor." Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (en banc). In order to prevail on a claim for the additional

costs incurred because of the late completion of a fixed-price government construction contract, "the contractor must show that the government's actions affected activities on the critical path of the contractor's performance of the contract." Kinetic Builder's Inc. v. Peters, 226 F.3d 1307, 1317 (Fed. Cir. 2000) (citing Essex Electro, 224 F.3d at 1295–96; Sauer Inc. v. Danzig, 224 F.3d 1340, 1345–46 (Fed. Cir. 2000)). "The reason that the determination of the critical path is crucial to the calculation of delay damages is that only construction work on the critical path ha[s] an impact upon the time in which the project [is] completed." Wilner, 24 F.3d at 1399 n. 5 (quoting G.M. Shupe, Inc. v. United States, 5 Cl. Ct. 662, 728 (1984)).

As mentioned above, "critical path" refers both to a method of schedule analysis and to a group of activities on a project that must be completed on a certain timeline to keep the project on schedule. See Wilner v. United States, 23 Cl. Ct. 241, 244–45 (1991). "[S]ome items of work are given no leeway and must be performed on schedule; otherwise the entire project will be delayed. These [] items are on the 'critical path.'" Id. at 245. Importantly, "[t]he critical path may continually evolve," because after work begins, "items not originally on the critical path can become critical." Id. (internal quotations and citations omitted).

In this case, UC submitted a "Construction Progress Schedule" to IBWC on October 5, 2010 and that schedule was approved. Pl.'s Mot. Ex. 51, ECF No. 107-4; see also Def.'s App. at A2257, ECF No. 119-8. The schedule showed that, for the approximate period from October 2010 through January 2011, the main category of "Critical Remaining Work," marked in red, was "Temp erosion control (Silt fence)." Def.'s App. at A2258. Immediately below this entry was a green segment labeled "Prep right of way." Id. The schedule key indicated that the color green meant "Remaining Work," in comparison with the color red, which represented "Critical Remaining Work." Id.

The government emphasizes that—notwithstanding the defects in the survey data—by January 18, 2011 UC had, in fact, completed construction of the silt fence as contemplated under the approved schedule. The defective survey could not have prevented UC from completing any tasks on the critical path to contract completion, according to the government, because it did not interfere with the timely accomplishment of this objective. See Dep. of Pl.'s Proposed Expert Jose Aguirre, Def.'s App. at A2610–11, ECF No. 119-9 (latest date for any silt fence work in "as-built schedule" is January 18, 2011).

The government's exclusive reliance on the approved schedule to determine the critical path is unavailing. UC contends that, in fact, the project schedule it submitted for approval did not set forth "UC's actual planned sequence or the duration of its work activities," even at the time the schedule was submitted. Pl.'s Reply at 4. It explains that it constructed its project schedule with the understanding that the Schedule Specification "required that the Progress Schedule employ the entire Contract Time." Id.; see also id. (In accordance with "Paragraphs 1.3 and 1.4A of the Schedule Specification and IBWC's directives, UC's Progress Schedule was expanded to use the entire Contract Time, and, as a result, did not reflect UC's actual plan for the work.");[11] Guzman Dep., Pl.'s Reply Ex. B at 55, ECF No. 128-1 ("[O]ur first schedule I believe

_____

[11] Paragraph 1.3 of the Construction Progress Documentation specification (numbered 01.32.00) provided in part that the schedule must "include all planned work activities and sequences and show Contract completion within the number of calendar days specified." Pl.'s Mot. Ex. 52, ECF

we submitted -- we showed finishing early. And if I remember correctly, that schedule was rejected and we were told that we had to use the entire time. We had to use all of the days.").

Further, UC notes, "both parties['] scheduling experts—Jose Aguirre for UC and Mark Boe for the government—agree that, despite the approval by IBWC . . . the original schedule was defective and did not fully comply with the Specifications." Pl. Reply at 4 (citing Ex. D at 50; Ex. E at 61–62). Thus, Mr. Aguirre testified that on the approved schedule "[t]he activities were not broken out by area," "[t]he durations were too high," and "[t]here wasn't enough detail." Pl.'s Reply Ex. D at 50. The approved schedule, he testified, "looks to me more like a preliminary schedule than an actual baseline schedule." Id. And the government's expert, Mr. Boe, agreed at least in part with Mr. Aguirre's views regarding the failure of the schedule to comply with contract specifications. Pl.'s Reply Ex. E at 61–62.

A fact-intensive inquiry is needed to determine both the critical path and the extent to which actions by the government improperly delayed the accomplishment of tasks on that path. Here, the Court has been presented with one approved schedule prepared before work began, and another prepared by an expert witness after work on the Project ended. Further, there is conflicting evidence in the record as to what the parties contemporaneously understood to be the critical path. For example, although the approved schedule identifies only completion of the silt fence and erosion control in the first several months of the Project, a contemporaneous email written by IBWC Acquisition Division Chief Hugo White stated that there were "97 outstanding RFI's—mostly impacting the critical path" and that among the issues covered by the RFIs were "the many encroachment [i.e., right-of-way] issues holding up the job." Pl.'s Mot. Ex. 28.

Finally, to the extent that the required schedule analysis involves a dispute between the parties' experts, the Court will have to make a credibility determination in its role as fact-finder. In light of these and other factual issues, the Court finds that summary judgment is, at this juncture, inappropriate with respect to UC's Early Delays claim.

## CONCLUSION

For the reasons discussed above, UC's motion is **GRANTED** as to its Defective Specifications claim and the government's cross-motion for summary judgment as to that claim is **DENIED**. The government's cross-motion is **GRANTED** as to the REA 7-8-9 claim, and UC's motion is **DENIED** as to that claim. In addition, within thirty days of the filing date of this Opinion and Order, the parties shall file a joint status report proposing a schedule to govern proceedings going forward. The report shall also inform the Court which issues in the five pending motions in limine remain for the Court to decide, in light of this opinion.

---

No. 107-4. Paragraph 1.4A provided that "[t]he complete [Progress Schedule] for the full duration of the Contract . . . shall be submitted within seven (7) calendar days after the Notice to Proceed is issued." Id. IBWC approved UC's proposed schedule on October 26, 2010. Pl.'s Mot. Ex. 51.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge